UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

KIM EMILE, ARIELLE EMILE and                          :
A.C.E., a minor child,                                :        Docket No.: 21-cv-03799
                                                      :
                                                      :
                                       Plaintiffs,    :
                                                      :        **VERIFIED SECOND AMENDED**
            -against-                                 :        **COMPLAINT**
                                                      :
ETHICAL CULTURE FIELDSTON SCHOOL,                     :
JESSICA L. BAGBY, NIGEL FURLONGE,                     :        PLAINTIFFS DEMAND A
CARL ANHALT, KYLE WILKIE GLASS and                    :        JURY TRIAL
"JOHN AND JANE DOES,"                                 :
said names being fictitious                           :
and intended to represent individual employees,       :
staff, teachers, and personnel of Ethical Culture     :
Fieldston School,                                     :
                                                      :
                                                      :
                                       Defendants.    :

----------------------------------------------------------------X

       Plaintiffs KIM EMILE (hereinafter "Kim"), ARIELLE EMILE (hereinafter "Arielle") and

A.C.E. (a minor child under the age of 18), (collectively, "the Plaintiffs"), by and through their

undersigned counsel, THE COCHRAN FIRM, as and for their Verified Amended Complaint in

this Action against Defendants ETHICAL CULTURE FIELDSTON SCHOOL (hereinafter

"Defendant ECFS"), JESSICA L. BAGBY (hereinafter "Defendant Bagby"), NIGEL

FURLONGE (hereinafter "Defendant Furlonge"), CARL ANHALT (hereinafter Defendant

Anhalt), KYLE WILKIE GLASS (hereinafter Defendant Wilkie Glass) and "JOHN AND JANE

DOES," (collectively referred to as "Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1.     This is a civil action for declaratory, compensatory, injunctive, punitive and equitable

     relief, as well as monetary damages, to redress Defendants' unlawful actions against the

Plaintiffs, including their unlawful discrimination and retaliation of the Plaintiffs in violation of New York State Human Rights Law, New York State Executive Law §§ 290, New York City Human Rights Law, Administrative Code of the City of New York, §§ 8-101 et seq., Intentional Infliction of Emotional Distress, Negligence and violations of 42 U.S.C. § 1981.

2.     During Arielle's and A.C.E.'s continued enrollment at Defendant ECFS, Plaintiffs have been and continue to be subjected to a pervasive pattern of discrimination and retaliation by the Defendants.

3.     Defendants' conduct was and continues to be knowing, malicious, willful, wanton and/or shows a reckless disregard for the Plaintiffs.  It has caused and continues to cause the Plaintiffs to suffer substantial economic and non-economic damages, reputational harm, and severe mental anguish and emotional distress.

## JURISDICTION & VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 1343 (1-4) and 2202 as this case involves a federal question based on the Plaintiffs' protected rights under Federal Law, 42 U.S.C. § 1981.  Plaintiffs further invoke the supplemental jurisdiction of this Court to adjudicate state and local claims pursuant to 28 U.S.C. § 1967.  The matter in controversy exceeds, exclusive of interests and costs, the sum of One Hundred Thousand Dollars ("$100,000").

5.     The venue of this action is based upon the fact that the incidents at issue occurred within this judicial district.

## PARTIES

**PLAINTIFFS**

*Plaintiff Arielle Emile*

6.      Plaintiff Arielle Emile was at all relevant times a New York State resident living in Bronx County.

7.      Plaintiff Arielle Emile was an African-American female student enrolled at Defendant ECFS from 2006 through 2020.

8.      Plaintiff Arielle Emile has been a student of ECFS since 2006, and she was required to sign contractual agreements as part of her enrollment at all relevant times.

*Plaintiff A.C.E.*

9.      Plaintiff A.C.E. was at all relevant times a New York State resident living in Bronx County.

10.     Plaintiff A.C.E. is an African-American male student enrolled at Defendant ECFS from 2007 through the present.

*Plaintiff Kim Emile*

11.     Plaintiff Kim Emile was at all relevant times a New York State resident living in Bronx County.

12.     Plaintiff Kim Emile is Arielle Emile's and A.C.E.'s mother and she has entered into contracts with Defendant ECFS each academic year that Arielle Emile and A.C.E. have been enrolled at Defendant ECFS since 2006 and 2007, respectively.


**<u>DEFENDANTS</u>**

*Defendant ECFS*

13.     Defendant ECFS is a private school, designated as a not-for-profit organization, located at 3901 Fieldston Road, Bronx, New York 10471.

14.     Defendant ECFS is an educational institution under the supervision of the Regents of the State of New York.

***The Individually-Named Defendants***

15.     At all relevant times, Defendant JESSICA L. BAGBY was ECFS' Head of School, and she participated directly in the unlawful discrimination, retaliation, intentional infliction of emotional distress, negligence and violations of 42 U.S.C. § 1981 taken against the Plaintiffs.

16.     At all relevant times, Defendant KYLE WILKIE GLASS was ECFS' Associate and/or Acting Head of School and/or an administrator, and he participated directly in the unlawful discrimination, retaliation, intentional infliction of emotional distress, negligence and violations of 42 U.S.C. § 1981 taken against the Plaintiffs.

17.     At all relevant times, NIGEL FURLONGE was the Principal of the Upper School at Fieldston and he participated in the unlawful discrimination, retaliation, intentional infliction of emotional distress, negligence and violations of 42 U.S.C. § 1981 taken against the Plaintiffs.

18.     At all relevant times, Carl Anhalt was an Administrator at Fieldston and he participated in the unlawful discrimination, retaliation, intentional infliction of emotional distress, negligence and violations of 42 U.S.C. § 1981 taken against the Plaintiffs.

19.     At all relevant times, Defendant "JOHN AND JANE DOES," said names being fictitious and intended to represent individual employees, staff, teachers, personnel, board members, trustees and agents of ECFS, directly participated in the unlawful discrimination, retaliation, intentional infliction of emotional distress, negligence and violations of 42 U.S.C.A. § 1981 taken against the Plaintiffs.

## PROCEDURAL REQUIREMENTS

19.     These claims have been properly commenced within the requisite time period upon which they are based.

20.     All conditions and requirements precedent to the commencement of this action have been met.

## FACTUAL ALLEGATIONS

21.     Inspired by Defendant ECFS' vision of providing their students with a progressive educational experience that promoted academic excellence and ethical learning, and being an alumna herself, Kim Emile enrolled her children, Arielle Emile and A.C.E., as pre-Kindergarteners in ECFS' Lower School after assurances by Defendant ECFS' Administration that they would receive a fair, equal and enriching educational experience at Defendant ECFS.

22.     As part of the enrollment process, Plaintiffs Kim Emile entered into annual contracts with Defendant ECFS which should have entitled her and her children, Arielle Emile and A.C.E., to an equal level of accommodations, educational experience and enforcement of the Code of Conduct with non-African-American parents and students of ECFS.

23.     The Plaintiff entered into annual contracts with Defendant ECFS from the time Arielle and A.C.E. were pre-Kindergarten students in 2006 and 2007, respectively, until the 2019/2020 academic year when Arielle became a high school senior and until the 2020/2021 academic year when A.C.E. became a high school senior.  At all relevant times, the contracts included a Code of Conduct as well as other school regulations and policies which Arielle and A.C.E. signed and agreed to abide.

24.     Arielle and A.C.E., as African-American students of Defendant ECFS, and their mother have been denied the equal access to accommodations, educational experience and the

equal enforcement of the Code of Conduct because of their race as African-Americans. Specifically, Arielle, A.C.E. and their mother have been and continue to be subjected to a slew of discriminatory and retaliatory actions on account of their race, their multiple complaints of race discrimination against staff and non-African-American members of the student body, and their advocacy in trying to eradicate discrimination at ECFS and in the larger community. In short, Defendant ECFS has created a hostile educational environment for African-American students that has rendered Arielle's and A.C.E.'s ECFS experience, the promised privileges and benefits as enrolled students, and enforcement of disciplinary policies aimed at preventing racially-offensive conduct below that of similarly-situated non-African-American students. Remarkably, the promised privileges and benefits as enrolled students at an Ivy League preparatory school, and ECFS' enforcement of discriminatory policies aimed at preventing racially-offensive conduct, were grossly below that of similarly-situated African-American students in violation of State and Federal law.

25.    Most urgently, A.C.E. has been reeling psychologically and emotionally after having learned that he had been referred to as a **"fucking nigger"** by two current, Caucasian male Fieldston students in a Snapchat conversation that he received on October 12, 2020.  He reported this to Defendant Bagby on February 16, 2021.  True to Defendant Bagby's and Wilkie Glass' natures, they and the other named Defendants collectively, have engaged in a retaliatory manner in an effort to silence A.C.E. and the Emile family. This lawsuit seeks to end this retaliation and get justice for the offenses suffered by the Plaintiffs.

## DISCRIMINATORY TREATMENT OF ARIELLE EMILE

26.    From Kindergarten onwards, Arielle began experiencing the discriminatory treatment endemic at ECFS, its failure to enforce its Code of Conduct against students who made

racially-offensive comments about African-Americans, and its disparate policies targeting its African-American students. When Arielle was in Kindergarten and A.C.E. was in pre-Kindergarten, L.K., a Caucasian student in the Class of 2019, called D.C., an African-American student, **"Nigger."** L.K. was not disciplined for this disparaging comment nor did he suffer any repercussions throughout his Fieldston tenure.

27.     Similarly, as a first-grade student excited at the prospect of Picture Day, Arielle wore her hair in Afro puffs along with large gold hoop earrings. She was ridiculed by a Caucasian student, who said in sum and substance, "You look like Mickey Mouse." This disparaging remark about Arielle's Black hairstyle by a Caucasian student in front of other Caucasian students was extremely upsetting to Arielle because it belittled and humiliated her, and denigrated her African-American cultural roots.

28.     These incidents were never addressed by ECFS and the institution failed to enforce its Code of Conduct against students who said racially offensive things about African-Americans.  Specifically, under ECFS' Code of Conduct, harassment based on race is prohibited and subject to punishment. However, ECFS did not implement this policy equally. Individuals who made racially offensive statements and committed racially insensitive acts against African-Americans were not punished, thereby fostering an environment of racial insensitivity toward African-American students, including Arielle.

29.     Arielle further experienced ECFS' pervasive discriminatory treatment during her participation in so-called "Comfort Groups" for math and science while she was in the third through fifth grades. Under the guise of these "Comfort Groups", ECFS created a system where students were placed in groups that were labeled Basic, Medium and More Advanced. Despite being gifted in math and science and being given the choice of selecting her own "Comfort Group"

(Medium), faculty always placed Arielle in the lowest group during third through fifth grades. Indeed, despite Arielle self-selecting the Medium "Comfort Group", her teacher would say to Arielle either in the middle of class or after class, "This is not the right place for you."

30.     Despite Ms. Emile speaking with Lower School Principal, George Burns, and expressing her concerns about the effect that such degrading comments had on Arielle, the "Comfort Group" placement decision was left to Rosemarie Buzzeo, Assistant Principal and the Head of the Math Department. In this regard, Ms. Emile was disingenuously told, "Everyone covers everything; it's just at a different pace." Most notably, all of the Black and Brown students in Arielle's grade during that time frame ultimately were placed in the lowest "Comfort Group."

31.     The discrimination and taunting did not stop in the Lower School. In the Middle School, Arielle was once again ridiculed for her Afrocentric box-braid hairstyle and her perceived lower socio-economic status. In one instance after flicking her braided hair, Arielle was ridiculed and denigrated in front of other students by a Caucasian classmate who loudly exclaimed, "Your braids smell!"

32.     Arielle was subjected to disparaging treatment further because of her race when a Caucasian student picked up a loose box braid extension, typically worn by African-American girls and women, and insultingly gave it to another African-American student, chasing her as if it belonged to her. Once again, this type of racially-motivated and discriminatory treatment was not addressed by the ECFS administration.

33.     In a similar vein, Arielle was demeaned for wearing an alumni gym shirt, which Ms. Emile had purchased from the school at a make-shift table that was set up in the beginning of the school year before the ordered uniforms had arrived, but which was the wrong gym uniform for class. Seeing Arielle in an alumni gym shirt, a Caucasian student commented that Arielle "was

poor" because she was in the wrong gym uniform. These types of comments -- which were endemic to ECFS' hostile educational environment and which were never addressed by the ECFS faculty or administration -- continued to have a deleterious effect on Arielle and affected her ability to learn, depriving her of an equal playing field as compared to Caucasian students.

34.     The incidents in which Arielle was subjected to a hostile educational environment and not given the same promised privileges and benefits as other non-African-American students continued relentlessly throughout high school. During the ninth grade, Arielle suffered a two-legged stress fracture which left her in a right full-leg cast and a boot on her other foot. Arielle was determined to continue taking classes live at the school but was discouraged from doing so.  In fact, she was definitively told to stay home because ECFS was not ADA compliant. Despite this "advice" from the ECFS administrators, Arielle attended classes and sadly was left to her own devices to get around campus and from class to class in her handicapped state. Notably, other students with physical disabilities were given opportunities to have a chaperone assist them in getting around campus and transitioning between classes.  Arielle was not provided this same accommodation.

35.     In tenth grade, Arielle continued to be subjected to the hostile educational environment at ECFS. During this year, Arielle was continuously and constantly asked by her dean and advisor, whether Arielle was "anxious" or "nervous" so much so that Ms. Emile sent emails asking her to stop suggesting and insinuating that Arielle was anxious or nervous. Unfortunately, this did not prevent her from making such remarks to Arielle despite Ms. Emile's strong and repeated requests that the comments cease and desist.

36.     Such comments did not just come from Arielle's advisor. Indeed, Arielle's chemistry teacher, also asked whether Arielle was "nervous" or "didn't understand the material."

Despite the fact that Arielle was a participant at a prestigious college preparatory program for seventh to twelfth grade students interested in pursuing a career in medicine or related STEM fields, and a National CURE Fellow, the duality of these comments on a constant basis only further destroyed Arielle's psyche, confidence and self-esteem.

37.     In this regard she was not made to feel accepted as compared to White students like a Fieldston trustee's granddaughter.  To the contrary, the trustee's granddaughter was made to feel at home (literally) as she was allowed to have her Black nanny deliver snacks and Starbucks beverages to her during class. In this fashion, Arielle was traumatized since she was made to believe that she had psychological issues, was not up to the academic standards of ECFS, and that she was "less than" similarly situated white students.  Meanwhile her White classmate, was treated like Fieldston royalty: allowed to eat meals and drink coffee in the comfort of the very same classroom almost as if she owned the place. Defendant Babgy also presented this White classmate with ornate cookie trays at school on her birthday.

38.     The disparaging and unequal treatment did not end there. In addition to the treatment previously detailed, while still in tenth grade and while on a field trip to Massachusetts chaperoned by an ECFS teacher, a student used the word **"nigger"** on a Facebook group page while on the field trip. This action prompted at least one Black student to leave the school permanently the following semester, mid-year.

39.     Arielle was subjected to even more racial hostility in eleventh grade. In the Fall/Winter of 2018/2019, Arielle was confronted with "No Nut November" and a widely-circulated video in which an African-American Fieldston student was called a **"nigger"** by a White Fieldston student. "No Nut November", as it was entitled, was a student-led SMS group chat controlled and managed in part by two male Fieldston students. These students challenged

Fieldston males not to ejaculate during the month of November, hence the name "No Nut November". To achieve this goal, males partaking in the challenge were instructed to look at photos of different Fieldston Black and Brown female students whose photos were posted to the chat as a way to sexually "turn off" the young men participating in the challenge. This objectification and denigration of Black and Brown young women and their bodies at Fieldston are clearly rooted in racism, sexism and classism, and serve to continue their oppression dating to the slave era, when Black and Brown women were considered to be subhuman.

40.     Despite the news of the "No Nut November" group chat being circulated among Fieldston students, faculty and administrators, and the fact that the group chat was specifically raised to Defendant Jessica Bagby directly, nothing was done to address this racist, misogynistic and vile rhetoric aimed at the young women of color attending ECFS. In fact, Arielle reported "No Nut November" to a trusted teacher as it related to Arielle feeling uncomfortable at school with her peers and her inability to focus on her schoolwork. Defendant Bagby's failure to act as well as that of the administrators, allowed for the hostile educational environment to thrive. This unchecked, extremely open, denigration of Black female students at Fieldston further decimated Arielle's psyche, and has emboldened those students wishing to discriminate and demean Blacks to do so without fear of reprisal. Indeed, as a result of this incident, Arielle was devastated both psychologically and emotionally. Further, it had the effect of creating an unequal educational environment for Arielle vis-à-vis her White counterparts.

41.     The disparate treatment against Arielle versus the favorable treatment White students received at ECFS extended into academics as well. Indeed, approximately 90% of Arielle's 2018 math class received learning accommodations, such as extra time for tests, homework and other similar assessments. Most, if not all, of those accommodated were Caucasian.

These "accommodated" students did so based on the unwritten but very well-used process of having a doctor's note prescribing a need for such extra time. This unwritten practice was endorsed by the school and gave White students a major advantage over Black students like Arielle, who very rarely if ever received accommodations. This practice was well known by Fieldston administrators and teachers who developed the practice, implemented the practice and who knew the disparate effect it had on Black students as compared to their White counterparts.

42.     In January/February 2019, a video of White Fieldston students calling a Black student, Malakai Hart, **"Nigger,"** was released and publicly disseminated. In protest of this and "No Nut November" as well as the openly, racially-hostile Fieldston educational environment and history, Arielle joined a group of students who took over and sat in on multiple school buildings in March 2019.  As per school history and policy, there was swift retaliation against the protestors.  Initially, the school turned off the heat in the building, didn't allow food deliveries and did not provide feminine hygiene products to the protestors.

43.     Next, despite being talented in STEM, in Physics, Arielle was subjected to open ridicule by her physics teacher, John Doe, in front of the entire class during her second semester. And, despite the fact that Arielle received an "A" in the first semester, following her participation in the protest, he gave her an "F" as a mid-term grade in the second semester. He pretextually justified the grade by suggesting that Arielle missed an exam due to illness and was given a zero.  He counted this test as a "zero" despite the fact that his policy prior to the protest was to allow students to make up tests when a test is missed under those circumstances.  However, John Doe did not allow Arielle to avail herself of his policy and thereby caused her extreme anxiety and stress.  Further, at the end of the second semester, he gave Arielle a B+ instead of an A- because he refused to round her grade up. Specifically, Arielle earned an 89.6% and thus was only 0.4%

away from an A-. Instead of simply rounding up, the teacher made Arielle take physics tests during the summer break months of June and July in order to earn her final grade of an A-.

44.     By contrast, White students routinely received inflated or changed grades without having to undergo additional testing, instruction or reassessment, for example:

- Student LR – junior year grade of a B+ changed during senior year to an A or A-;
- Student LR – grades changed during senior year right before FERPA submission by the Assistant Principal

45.     Not only was Arielle subjected to a hostile learning environment and disparate treatment grade-wise, but Arielle and other African-American students were also denied enrollment in classes they wanted to attend. For example, during Arielle's senior year, Paul Church, the Head of Science Department, denied Arielle enrollment in his Advanced Biology class under the pretext of her never having been in an advanced class before and that she received B's in math.

46.     Tellingly, Dr. Church also denied enrollment in his Advanced Biology class to Gabriel Hostin, another African-American student who graduated in the Class of 2020 and matriculated at Harvard University. In that instance, however, Dr. Church told Gabriel's mother, Sunny Hostin, that there was no room in the class. Ms. Hostin questioned Dr. Church on that claim and ultimately asked for a list of all African-American students who had ever been enrolled in Dr. Church's Advanced Biology class. Revealingly, that requested list was never provided to Ms. Hostin and ultimately Dr. Church allowed Gabriel to enroll in the class without further issue.

47.     In addition to facing disparate treatment as compared to their Caucasian counterparts in academic life, Arielle also faced disparate and unequal treatment when she and Gabriel Hostin decided to run for Co-Presidents of the student body. As candidates who had wide-spread support and were considered to be a shoe-in, Arielle and Gabriel would have been the first African-American candidates to win the co-presidency. Unfortunately, during the campaign, two

members of the ECFS faculty approached Arielle and encouraged Arielle to replace Gabriel and run for the co-presidency with another student. Ultimately Arielle and Gabriel ran as co-presidents, but only after their mothers met with several faculty members.

48.     Once again during senior year, ECFS proved itself not to be the progressive bastion of educational, racial and social justice that it has long proclaimed itself to be. As a tri-season athlete with a 3.98 GPA and admission to Harvard University, Gabriel Hostin was the perfect candidate for Speaker at the Sports Dinner, subject to a vote by the student body. Despite his many accomplishments, an anonymous internet petition circulated around the school with a red "X" through Gabriel's face as a candidate for Speaker. Ms. Hostin raised these concerns with Defendant Bagby and was told point-blank in sum and substance, "You should just be happy that he [Gabriel] got into Harvard."

49.     Not only was Gabriel discouraged and disparaged by fellow students from being Speaker of the Sports Dinner, but Arielle herself was a candidate for graduation speaker, which was also voted upon by the student body. Despite being a strong candidate, Arielle allegedly was not chosen to be graduation speaker. Once again, despite numerous requests to release the vote count, ECFS chose to be undemocratic and refused to release the count. Ultimately, two White male students and an Indian female student were the chosen speakers at graduation. Not surprisingly, the year before, one of those speakers was L.K. who had previously called a Black student a **"nigger"** during Arielle's Kindergarten year. Adding further insult to this selection, Black students were warned that if any of them demonstrated their displeasure with L.K.'s selection due to his racist past by taking a knee or standing up during his speech, they would be removed from the graduation ceremony and would not receive their diplomas.

50.     In a final attempt at intimidation and insult during Arielle's senior year, and in an incident strikingly similar to the incident where watermelons were strategically placed around campus and on an African-American faculty member's desk, Arielle was subjected to a racially offensive incident in her final second semester: a banana with the handwritten names of an African-American math teacher, and John Doe, an African-American student, was left on the desk of the author, a White male student, during class. Having a banana with the names of African-Americans on it is unmistakably racist in that it analogizes Black people with monkeys who eat bananas. This racially offensive and divisive action was the final straw that left an ineradicable mark of psychological and emotional pain and suffering on Arielle from her time at ECFS.

### DISCRIMINATORY TREATMENT OF A.C.E.

51.     Plaintiff Kim Emile's younger child, A.C.E., also began experiencing from a young age the discriminatory treatment endemic at ECFS, its failure to enforce its Code of Conduct against students who made racially offensive comments about African-Americans, and its disparate policies targeting its African-American students.

52.     At the outset of his ECFS education, A.C.E. was intellectually advanced for his age and entered pre-Kindergarten in 2007 doing triple-digit addition and subtraction. As a first-grade student, Ms. Emile was told that A.C.E. was eligible to be in a special program sponsored by the Lower School Assistant Principal, Rosemarie Buzzeo. Enrollment in the "Assistant Principal Program", as it was dubbed, recognized students who were the best, brightest and fastest in the class. Although extremely deserving, A.C.E. was not allowed to participate in this specialized advanced program. When Ms. Emile questioned the teacher at the time, the teacher replied, "This is a battle you're not going to win. The other family has more money and more power." This type

of action was just the beginning of the unfair treatment A.C.E. would endure vis-à-vis his White counterparts during his tenure at ECFS.

53.     As a second-grade student, A.C.E. would finish his math work early and instead of being offered additional work to challenge and develop his intellect, Ms. Emile was told that A.C.E. would be allowed to color with crayons while the other White students finished their work. Indeed, even in fifth grade, A.C.E. received perfect scores on every spelling test and was the fastest in his work but was still not getting the accolades or credit that he rightfully deserved. In this same year, he asked to be moved up a level in the math program to the advanced "Comfort Group". When A.C.E. approached Assistant Principal Rosemarie Buzzeo to discuss this issue, she looked down at A.C.E.'s untied shoes and said in sum and substance "How can you possibly be a good soccer player if you can't even tie your own shoes? You need to stay in the group you are in." This statement was particularly emotionally harmful to the psyche of A.C.E. as soccer was something that he excelled in and was very proud of.

54.     Beginning in the Lower School, A.C.E. faced other discriminatory and racist incidents from both ECFS faculty and students alike. First, during elementary school, A.C.E. would be subjected to the "Punishment Circle" which punished students whose parents were late in picking their children up after regular school hours. Although this lateness was not the students' fault, they were punished by an ECFS administrator by being placed into "the circle of punishment" in the middle of the gym. Notably, the students singled out and subjected to this unfair punitive action because of their parents' lateness were primarily students of color.

55.     In sixth grade while enrolled in a class entitled, "Africans & The Diaspora", A.C.E. was playing soccer during recess when he was called a "slave" by a Caucasian schoolmate, J.S.B. In fact, J.S.B. went so far as to say, "Bow down to me! You are my slave," while taking his jacket

and whipping A.C.E. with it. Not only did A.C.E. report this intolerable, racist behavior to then-Assistant Principal Jason Ford, but another student who heard J.S.B.'s words also reported it to an administrator in the front office.

56.     Instead of addressing this unacceptable behavior from a student at one of the most renowned "progressive" schools in the country, ECFS faculty and administration chose J.S.B.'s "apology" which was simply, "I'm sorry it happened -- *if it ever happened*." This subpar apology and gaslighting – "if it ever happened" -- had a deleterious effect on A.C.E.'s psyche as well as his emotional health. In fact, for at least a week thereafter, A.C.E. wore a Frederick Douglass T-shirt emblazoned with the words, "I am not your slave" and, the  Board President, commented to Ms. Emile, "I can't believe this happened to A.C.E. I'm going to make sure this never happens again." Unfortunately, the Board President's promise fell flat as that was the same year that the infamous racist senior prank that involved students placing watermelons strategically around ECFS' campus -- including on the desk of the senior class dean, Marie Johnson Mrkonjic, who is African-American -- occurred. This offensive and racially-motivated conduct prompted a swift uproar and outcry to which A.C.E. was subjected and had further destructive effects on his psyche.

57.     Indeed, these racially offensive acts fostered and perpetuated a racist stereotype that denigrated African-American individuals and highlighted the racial tension and open hostility against African-Americans that permeated the school's educational and social environment.  As a result of ECFS' failure to address the watermelon incident, Arielle, A.C.E. and their mom were hurt, emotionally scarred and psychologically injured.

58.     One of the most denigrating comments that a person could make about an African-American youth came when A.C.E. was in the eighth grade. ECFS teacher, Erik Hanson, met with Ms. Emile regarding A.C.E.'s academic performance in his class. Mr. Hanson indicated that he

was putting A.C.E. on "the list" because **he needs to be in the system**" since A.C.E. had an interim "C" grade in the class.

59.     When Ms. Emile took understandable umbrage at Mr. Hanson's comment and told him that he should never say that an African-American male should be put "in the system", Mr. Hanson brushed Ms. Emile's concerns off. In fact, when Ms. Emile took her sister to meet with Mr. Hanson about the situation and Mr. Hanson's highly inappropriate and racist comment about putting A.C.E. "in the system", Mr. Hanson simply indicated, "That's exactly what I meant."

60.     To add racist insult to racist injury, Defendant Bagby requested a meeting with Ms. Emile in which she indicated that A.C.E. was in the wrong school and that it was time for him to leave the school. Present at this meeting were: Defendant Bagby, Liz Fernandez (Assistant Head of School for Ethical Education & Social Impact), Ms. Emile, Ms. Emile's sister and mother, and Assistant Principal Chia-Chee Chiu. Most notably, Mr. Hanson, who was the Head of the Latin Department and a parent with children attending ECFS, was absent.

61.     At this meeting, Defendant Bagby further exacerbated the previous racist remarks uttered by Mr. Hanson by making her own racist, insulting and injurious remarks. Incredibly, despite Ms. Emile being an alumna of ECFS herself and A.C.E. being a gifted ECFS student since pre-Kindergarten, Defendant Bagby insinuated that A.C.E. did not belong at ECFS. Astoundingly, Defendant Bagby pointedly told Ms. Emile, "Maybe this isn't the school for A.C.E." and "High school is coming up. Maybe this is a good time for transition."

62.     Even after these exceptionally offensive and damaging comments, Ms. Emile and A.C.E. were subjected to further detrimental remarks when Ms. Emile met with Liz Fernandez and Erik Hanson. Yet again, Ms. Emile and A.C.E. were made to believe that A.C.E. was incapable of

performing well academically in Latin. Mr. Hanson directly told A.C.E., "Maybe you shouldn't take Latin and take Spanish instead going forward."

63.      In the ninth grade, not only was A.C.E. subjected to the racist video in which two Caucasian students repeatedly uttered the word, **"nigger"** *ad nauseum* while singing a song and claimed to be light-skinned Blacks, A.C.E. also was subjected to denigrating comments made to him by his Biology teacher. In fact, she indicated that A.C.E. was "slow" and did not turn in his homework. Instead of offering A.C.E. educational services and support to help him improve his performance, or acknowledging the racial trauma that he was experiencing, A.C.E. was subjected further to denigrating comments by his advisor, when he told A.C.E. directly, "You're not so stupid and are capable of getting a B- if you work really hard. That is a good grade for you. Then you can stay in this school."  This type of denigration was not given to Non-African American students at Fieldston.

64.      When A.C.E. entered high school as a freshman, Ms. Emile advocated for him to enroll in advanced math, Group 5.  He was the only African-American student in the class. A.C.E. was not given the same resources and support as his Caucasian peers. Ms. Emile consistently asked the teacher for additional resources or methods to support A.C.E. They were never granted.  Because of this lack of support by ECFS, he was quickly removed and placed in a middle math group, Group 3, mid-semester.

65.      Although A.C.E. may have needed additional instruction or accommodations like extra time to take exams and finish assignments due to the ongoing effects of racial trauma, such as the other 76% of the students in his grade, A.C.E. was not offered additional services or accommodations. Rather, in tenth grade, his former Biology teacher suggested that A.C.E. take

Earth Chemistry instead of regular Chemistry. This signaled to A.C.E. that he was not academically fit or capable of taking regular Chemistry as his White counterparts were.

66.    A.C.E. endured other racist, denigrating comments made by ECFS faculty during his tenth-grade year. A.C.E.'s Algebra teacher, Gia Moreno, made belittling and condescending comments to A.C.E. in front of the entire class whereas she did not make such comments about White students. Indeed, after the protest, which was already psychologically and emotionally draining, Ms. Moreno told A.C.E., "You can't take notes. You're like a seventh grader!" Defendant Carl Anhalt had to step in and finish teaching the course to A.C.E. on a one-on-one basis further stigmatizing A.C.E. since this did not happen to Caucasian students at the school.

67.    The thirteen years of racial animus, discrimination and damaging verbal assaults that A.C.E. experienced at ECFS culminated in 2020 during his senior year of high school. In October 2020, a Caucasian student, "accidently" sent A.C.E. a screenshot of a Snapchat text exchange between two Caucasian students, A.O. and O.B. Incredibly, the screenshotted text message revealed O.B's text to A.O. which read, **"[A.C.E.] is a fucking nigger."**

68.    A.C.E. and his family members' were hesitant to complain about the discrimination they faced at the hands of the school due to their well supported fear that the school would retaliate against them. This fear was heightened in 2018 when Defendant Bagby defamed an African-American Fieldston eighth-grader (MHB) and his parents after they filed a lawsuit alleging discrimination and retaliation against her and the school. In response, the African-American eighth-grade student's parents and the student (M.H.B.) himself were blasted in an email that Defendant Bagby sent out to the entire Fieldston community calling them profiteers who put the pursuit of money over the lives and safety of children despite the fact that they were college educators.

69.     As a result of the thirteen years of racial hostility, bigotry, educational inequities and prejudice, A.C.E. has suffered a tremendous amount of harm educationally, psychologically and emotionally. Indeed, A.C.E.'s ability to socialize has been and continues to be harmed; his ability to concentrate on his schoolwork has been and continues to be negatively impacted, as well as his ability to fairly compete academically with his non-African-American peers who were not subjected to this type of discrimination. Despite entering pre-Kindergarten as a bright-eyed, lively, energetic and advanced four-year-old, A.C.E. has been significantly emotionally, socially and psychologically impacted due to the years of racial hostility, bigotry, educational inequities and prejudice.

**PRIOR DISCRIMINATORY TREATMENT OF
OTHER AFRICAN-AMERICAN STUDENTS AND FIELDSTON'S ADMISSION THAT
IT HAS TRAUMATIZED AFRICAN AMERICAN STUDENTS**

70.     Defendant ECFS' abject failure to address the numerous instances of racial hostility, bigotry, educational inequities and prejudice against its African-American students are well-documented and well-known, which has had a chilling effect and caused extreme anxiety in reporting other instances of racial hostility, bigotry, educational inequities and prejudice, particularly by the Emile family.

71.     Malakai Hart, an African-American student, experienced escalating discrimination over the course of his tenure at ECFS which was known to the Emile family and had a chilling effect on reporting the discriminatory maltreatment the Emiles suffered during their time at ECFS. Malakai's educational experience was negatively affected, his ability to socialize was harmed, his ability to concentrate on his schoolwork was negatively impacted, as well as his ability to compete academically with his non-African-American peers who were not subjected to discrimination.

72.     Malakai Hart was discriminated against because he was constantly being stopped by Defendant ECFS' security forces on the ECFS campus, despite Malakai being a student, whereas Malakai's Caucasian counterparts were not stopped.

73.     In addition to Defendant ECFS' security practices, Defendant ECFS also failed to enforce its Code of Conduct against students who said racially offensive things about African-Americans.  Specifically, under ECFS' Code of Conduct harassment based on race is prohibited and subject to punishment. However, Defendant ECFS did not implement this policy equally as individuals who made racially offensive statements and committed racially insensitive acts against African-Americans were not punished thereby fostering an environment of racial insensitivity toward African-American students, including Malakai.

74.     When Malakai was in the eighth grade, the death of Eric Garner at the hands of police officers was a significant current event concerning police misconduct against African-Americans.  Saddened by this story, Malakai attempted to engage his classmates in a discussion of race during his English class.  During the discussion, one of the Plaintiff's non-African-American classmates, D.R., offended Malakai and common respect and decency toward African-American people by saying that Mr. Garner deserved to die for selling loose cigarettes. Despite the presence of a teacher who witnessed this harassing and racially offensive statement, nothing was done to enforce Defendant ECFS' Code of Conduct and discipline D.R.

75.     Instead, Plaintiff Malakai led a walk out of the class in protest of D.R.'s racially harassing comments.  Despite this protest, Defendant ECFS failed to take action against D.R.  By not enforcing ECFS' own Code of Conduct as it related to racially offensive conduct aimed at African-Americans, Malakai and other Black students were made to feel unwanted and

unwelcomed.  This, in turn caused Malakai and his parents to suffer psychological and emotional pain.

76.     Additionally, in contrast to Defendant ECFS' failure to enforce its Code of Conduct as it related to the discipline of students who made racist comments against African-Americans, Malakai and other African-American students were subjected to discipline for much smaller alleged infractions.  For example, in ECFS' library on or about May 18, 2016, despite the fact that he was complying with the established library rules, Malakai was accused of violating the Quiet Zone rules and, without having an opportunity to defend himself, was yelled at, publicly humiliated and forced to leave the library by a non-African-American librarian.  This punishment did not comply with the procedures that were set for discipline relating to violations of the Code of Conduct.  In addition, since the reprimand was done publicly and in front of Malakai's peers it was emotionally devastating to Malakai and made him feel humiliated and unwelcomed.  Moreover, it prevented Malakai from the equal use of ECFS' accommodations.  Non-African-American students were not subjected to such treatment.

77.     After being victimized by this improper punishment under Defendant ECFS' Code of Conduct, Malakai and his parents complained to the ninth-grade dean, John Reyes.  Although Dean Reyes acknowledged that the Code of Conduct was improperly applied to Malakai, Defendant ECFS did not take any action to address the clear violation and disparate enforcement of its Code of Conduct.  The fact that Malakai's dean acknowledged this discriminatory treatment and did nothing left Malakai and his parents emotionally and psychologically hurt.

78.     Moreover, during Malakai's first year in Defendant ECFS' Upper School, some Upper School students as a class prank placed watermelons in the office of an African-American dean.  This racially offensive act fostered and perpetuated a racist stereotype that denigrated

African-American individuals and spotlighted the racial tension and open hostility against African-Americans that permeated the school's educational and social environment.

79.     The lack of punishment to the non-African-American students who have committed racially discriminatory and/or racially offensive acts also shows the disparity in punishment meted out to African-American students under Defendant ECFS' disciplinary policy.  African-American students are more harshly disciplined than non-African-American students who have been found to have violated the same or less serious offenses. For example, non-African-American students who were accused of engaging in sexual misconduct received little to no discipline, were not reported to the police or other agencies in light of the seriousness of the allegations that were prohibited by ECFS' Code of Conduct.

80.     As a result of these obvious disparities in the way rules and policies are applied to African-American students versus their non-African-American counterparts, students held a week-long student protest in March 2019.

81. In response to the protest, Defendant Bagby admitted that Defendant ECFS had maintained a racially hostile environment for students of color and caused much injury and pain.  As she stated:

> **"The current situation arises out of multi-year-racial trauma our students have experienced while at school. My colleagues and I could not be more profoundly sorry for this reality."**

82.     These facts plus Defendant Bagby's admission leaves no doubt that Defendant ECFS and the named Defendants have discriminated and retaliated against African-American students and their families on the basis of their race and for complaining about discrimination.

83.     However, following the school take over, the filing of two race discrimination and retaliation complaints, and numerous other complaints of discrimination, instead of implementing

practices and policies aimed at ending the racially hostile environment at Fieldston, Defendant Bagby, Defendant Wilkie Glass and other administrators including Chris Harper created and developed a policy and practice to subvert complaints of race discrimination by retaliating against those who made such complaints.

84.     This policy was named "No Blind Spots" or, in other words, "No B.S."

85.     The policy was endorsed by, created by and implemented by Defendants Bagby, Wilkie Glass, Furlong and Anhalt to shield the school from liability for acts of discrimination and retaliation.

86.     The "No Blind Spot" or "No B.S." policy was not put into any of Fieldston's stated policy manuals, nor was it disclosed to anyone outside of Senior Administration, Human Resources or other individuals charged with "investigating" complaints of discrimination and/or retaliation at the School.

87.     At its root, the "No B.S." policy eradicated the truth-seeking purpose of discrimination complaint investigations and instead required that the investigator develop a "defensible position" for the school immediately after conducting the investigation.

88.     In this fashion, the Defendants created and employed a policy contrary to the very nature of the school's title: "Ethical."

89.     Instead, the policy called for the investigators of discrimination complaints to manipulate the investigations in a way to defend the school against liability for discrimination and retaliation complaints made against it no matter what the truth of the investigation revealed.


### RETALIATION AGAINST THE EMILE FAMILY FOR REPORTING RACIAL HOSTILITY, BIGOTRY, EDUCATIONAL INEQUITIES AND PREJUDICE

90.     Due to the racially hostile environment that exists at Defendant ECFS, Defendants' abject failure to punish past offenders in order to deter future racist behavior against Blacks, and the fear of retaliation that the school has used in past cases when complaints of racism against African-American families have been raised, the Emile family hesitated to raise the issues of racial hostility, bigotry, educational inequities and prejudice with Defendants.

91.     Indeed, in a letter dated February 16, 2021, outlining the aforementioned racist conduct against the Emile family, the Emile family through counsel expected that "the school will immediately investigate this matter and will not retaliate against A.C.E. or his family as a result of his complaint [regarding O.B. and A.O. writing on social media, '**[A.C.E.] is a fucking nigger'**]."

92.     Instead of an immediate and thorough investigation regarding A.C.E.'s complaint about O.B. and A.O. calling A.C.E. **"a fucking nigger"**, Defendant ECFS and Defendant Bagby retaliated against the Emile family by not investigating A.C.E.'s complaint. In fact, Defendant ECFS and Defendant Bagby did not begin an investigation until a month later.

93.     In addition to retaliating against Plaintiff Kim and A.C.E. by not investigating A.C.E.'s complaint of being called **"a fucking nigger"** immediately, Defendants ECFS, Bagby, Wilkie Glass, Furlong, and Anhalt further retaliated against Plaintiffs by employing the "No B.S." policy and developing when they finally did investigate the complaint.

94.     To begin, Defendant Anhalt was assigned to investigate the complaint that A.C.E. made despite the fact that he was the longtime coach of one of the students about whom A.C.E. complained.

95.     After Defendant Anhalt interviewed this student, and in developing a defensible position, the student made a complaint about A.C.E. that led to  A.C.E. himself  being investigated for posting offensive language and images on social media. Indeed, attempting to instill fear in the

Emile family by implicating A.C.E. as the subject of an investigation himself did nothing but continue to demonstrate the lengths to which Defendant ECFS and Bagby would go to silence and gag African-American students at ECFS when they suffered discrimination, bigotry, racial animus or educational inequities.  It also showed how the Defendants employed the "No B.S." policy to create a defensible position to escape liability.

96.     Defendant ECFS and Defendant Bagby further retaliated against Plaintiffs Kim and A.C.E. Emile by initially assigning Defendant Carl Anhalt -- A.O.'s water polo coach and close confidante — to investigate A.C.E.'s complaint. Defendant Anhalt conducted interviews with A.O. and O.B. and after those interviews, was when A.C.E. was accused of making inappropriate comments.

97.     Defendant ECFS and Defendant Bagby scheduled an interview of Plaintiff A.C.E. on March 25, 2021, on campus to be led by Defendants Nigel Furlonge, the outgoing Upper School principal, and Kenny Graves, Assistant Principal for Academic Life & Director of Studies.

98.     Defendants further retaliated against A.C.E. by insisting that he could not have his retained counsel or his godmother, Sunny Hostin, at the meeting because the interview was part of "an internal school investigation", and that no lawyers would be involved in the process.  In fact, Defendant Furlonge stated that if A.C.E. did not abide by this strict rule of no lawyers present, the School would not interview A.C.E. and instead would be ready to make it's determination regarding the outcome of the investigation.

99.     After agreeing to all conditions placed on this "internal school investigation" -- including forgoing Sunny Hostin's presence as A.C.E.'s godmother and forgoing their retained counsel for a no-holds-barred interview – A.C.E. answered to the best of his ability all questions posed to him by Defendant Furlonge and Assistant Principal Graves during their interrogation.

100.     This was simply a pretext to further retaliate against A.E, and Kim.  Despite stating that they were prepared to conclude the investigation with or without A.C.E.'s participation, and after telling Kim Emile and A.C.E. that A.O. and O.B. had admitted to calling A.C.E. a **"fucking nigger,"** the Defendants did not provide any conclusions to the investigation.

101.     Despite agreeing to all conditions placed on this "internal school investigation" and being the utmost cooperative, Plaintiffs A.C.E. and Kim Emile were further retaliated against on April 7, 2021, when they were advised that ECFS engaged attorney Nancy Kestenbaum of the high-powered law firm of Covington & Burling to investigate A.C.E.'s complaint and the alleged conduct concerning A.C.E., and to advise Defendant ECFS on these matters. Further, Plaintiffs were advised that Attorney Kestenbaum sought access to all of A.C.E.'s personal electronic devices and social media accounts.  The retention of Kestenbaum and her law firm was done pursuant to the "No B.S." policy and called for her to find in favor of ECFS so that the school and the individually named defendants would have a defensible position to use against the Emile family.

102.     Indeed, in this latest round of retaliatory conduct, in an April 14, 2021 email, Defendant Nigel Furlonge informed Plaintiff Kim Emile that Attorney Kestenbaum, a seasoned and highly-experienced attorney, would be contacting the Emiles to interrogate A.C.E. further "concerning the use of inappropriate language and/or possible distribution of offensive and hostile photos and images." This underhandedness by Defendants further demonstrates that this "internal school investigation" and interview was a sham.

103.     As a result of the investigation to date, Defendant Furlonge and Assistant Principal Graves acknowledged that O.B. and A.O. have admitted and confessed to calling Plaintiff A.C.E. a **"nigger"** on two separate occasions. To date and upon information and belief, O.B. and A.O.

have not been disciplined for their racial animus, bigotry and prejudice against A.C.E. Instead, A.C.E. has been retaliated against repeatedly after filing his formal complaint and remains the focus and subject of the "impartial investigation" being disingenuously conducted by Defendants.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violations of 42 U.S.C. § 1981 Discrimination and Retaliation)

104.     Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 149, inclusive, as if fully set forth herein.

105.     As set forth above, the Defendants have denied the Plaintiffs on the basis of their race the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by non-African-American citizens as of the United States in violation of 42 U.S.C. § 1981 as members of the ECFS community. Specifically, Defendants have discriminated against the Plaintiffs, an African-American family, by denying to them equal terms and conditions enjoyment of all benefits, privileges, terms and conditions with respect to the accommodations, enforcement of disciplinary rules, complaint procedures and investigations within the school that were part of their contractual agreement. By ostracizing families who complained about race discrimination and coddled those students who committed racially offensive acts, Defendants also violated 42 U.S.C. § 1981.

106.     As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered and continue to suffer monetary and/or economic damage.

107.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-

confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

108.     Specifically, the Defendants' failure to enforce equally its disciplinary policies regarding offensive speech and conduct has allowed racism to permeate Defendant ECFS' academic environment and has caused Kim Emile, Arielle and A.C.E. emotional injury, harm and upset that has disparately affected their ability to learn, thrive and enjoy the academic experience in the same way that their non-African-American classmates and parents have been allowed. Moreover, when A.C.E. and Kim Emile complained, they were and continue to be retaliated against cause emotional harm.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Race Discrimination Under New York State Human Rights Law)**

109.     Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 154, inclusive, as if fully set forth herein.

110.     By reason of the foregoing, the Defendants have violated New York Executive Law § 296 et seq., New York State Human Rights Law, by discriminating against the Plaintiffs on the basis of their race by denying to them equal terms and conditions with respect to accommodations within the school, including, but not limited to, subjecting them to disparate treatment and a hostile work environment, on account of their race. Specifically, because Plaintiffs are an African-American family, they were treated differently than non-African-American families in that Arielle and A.C.E. were subjected to frequent racial hostility, bigotry, educational inequities and prejudice because of their race and their complaints of discrimination went unaddressed. No non-African-American family has been treated the same. In fact, non-African-American families have

historically been coddled in situations where they have complained about misconduct by administration and/or other students.

111.    Moreover, Defendants' policies and practices have a disparate impact on African-American families enrolled in their school like the Plaintiffs. These policies and practices have forced their African-American families, like the Plaintiffs, to be subjected to disparate treatment relating to educational inequities, the imposition of discipline and other insults as described herein.

112.    By reason of the foregoing, the Plaintiffs have suffered and continue to suffer injuries and damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Retaliation Under New York State Human Rights Law)**

113.    Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 158, inclusive, as if fully set forth herein.

114.    Defendants have retaliated against the Plaintiffs by, inter alia, harassing them, threatening them, using scare tactics, humiliating them, creating a hostile school environment that tacitly encouraged and endorsed racist speech, racially offensive conduct and disparate treatment. These acts caused tremendous economic, emotional and psychological harm and made it more difficult for Arielle and A.C.E. to do their school work than non-African-American students who were not subjected to such treatment. These retaliatory acts taken by Defendants for Plaintiffs' opposition to Defendants' discriminatory practices toward themselves and other families of color and/or their participation in criticizing and lodging complaints about Defendants' discriminatory practices toward themselves and other members of the ECFS community violated the New York State Human Rights law.

115.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of New York State Human Rights Law, Plaintiffs have suffered and continue to suffer monetary and/or economic damages and emotional and psychological injuries as a result of having to fight against Defendants' discriminatory policies and practices.

116.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the New York State Human Rights Law, the Plaintiffs have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of New York State Human Rights Law)**

117.    Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 162, inclusive, as if fully set forth herein.

118.    Defendants Bagby,  Furlonge, Anhalt and "JOHN AND JANE DOES" knowingly and/or recklessly aided and abetted the unlawful practices, discrimination and retaliation against the Plaintiffs in violation of the New York State Human Right Law by actively participating in the unlawful conduct set forth above.

119.    Defendants Bagby, Furlonge, Anhalt and "JOHN AND JANE DOES" have discriminated against the Plaintiffs on the basis of their race and retaliated against them for engaging in protected activity.

120.    As a direct and proximate result of Defendants Bagby, Furlonge, Anhalt and "JOHN AND JANE DOES" unlawful discrimination and retaliation against Plaintiffs in violation

of the New York State Human Rights Law, Plaintiffs have suffered and continue to suffer monetary and/or economic damages and psychological injuries for which they are entitled to an award of monetary damages and other relief.

121.   As a direct and proximate result of Defendants Bagby, Furlonge, Anhalt and "JOHN AND JANE DOES" unlawful discrimination and retaliation against Plaintiffs in violation of the New York State Human Rights Law, Plaintiffs have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Race Discrimination Under New York City Human Rights Law)**

122.   Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 167, inclusive, as if fully set forth herein.

123.   By reason of the foregoing, the Defendants have violated New York City Human Rights Law, by discriminating against the Plaintiffs on the basis of their race by denying to them equal terms and conditions with respect to accommodations within their school, including, but not limited to, subjecting them to disparate treatment in the application of school rules and procedures on account of their race and a hostile school environment. Specifically, because Plaintiffs are an African-American family, they were treated less well than non-African-American families in that Arielle and A.C.E. were subjected to racial animus, bigotry, educational inequities and prejudice because of their race and complaints of discrimination that went unaddressed, their denial of equal access to the school's accommodations and the exposure to retaliatory attacks against those who complained about discrimination like M.H.B.'s family and their own. No non-African-American

family has been treated the same. In fact, non-African-American families have historically been coddled in situations where they have complained about misconduct by administration and/or other students. In addition, the failure of Defendant ECFS to apply its disciplinary policies equally against non-African-American students who engaged in racially offensive speech and conduct created a hostile school environment. This hostile school environment was also caused by Defendant ECFS' open hostility to individuals who complained about race discrimination.

124.    Moreover, Defendants' policies and practices have a disparate impact on African-American families enrolled in their school like the Plaintiffs.  These policies and practice forced African-American families, like the Plaintiffs, to be subjected to racial animus, bigotry, educational inequities, prejudice and retaliatory conduct when they lodge complaints.

125.    By reason of the foregoing, the Plaintiffs have suffered and continue to suffer both economic and psychological injuries and damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Retaliation Under New York City Human Rights Law)**

126.    Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 171, inclusive, as if fully set forth herein.

127.    Defendants have retaliated against Plaintiffs by, inter alia, by harassing them, ostracizing them, threatening them, humiliating them, making false allegations of student misconduct, and for failing to adequately assist Arielle's and A.C.E.'s academic progress after suffering these insults in violation of the New York City Human Rights Law for their opposition to Defendants' discriminatory practices toward themselves and other families of color and/or their participation in criticizing and lodging complaints about Defendants' discriminatory practices toward themselves and other members of the ECFS community.

128.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the New York City Human Rights Law, Plaintiffs suffered, and continue to suffer, monetary and/or economic harm, psychological and emotional injuries for which they are entitled to an award of damages.

129.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the New York City Human Rights Law, Plaintiffs suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

130.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiffs are entitled to an award of punitive damages.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of New York City Human Rights Law)

131.     Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 176, inclusive, as if fully set forth herein.

132.     Defendants Bagby, Furlonge, Anhalt and "JOHN AND JANE DOES" knowingly or recklessly aided and abetted in the unlawful employment practices, discrimination and retaliation against Plaintiffs in violation of the New York City Human Rights Law.

133.     As a direct and proximate result, Plaintiffs suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of damages.

134.     As a direct and proximate result, Plaintiffs suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

135.    Defendants Bagby, Furlonge, Anhalt and "JOHN AND JANE DOES" unlawful actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiffs are entitled to an award of punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Negligent Hiring, Training and Supervision)

136.    Plaintiffs hereby repeat and reallege each and every allegation in paragraphs 1 through 181, inclusive, as if fully set forth herein.

137.    At all relevant times, Defendant ECFS had a duty to screen applicants for hire, retention or discharge those employees who are not fit, suitable, properly trained and instructed, constituting a potential menace, hazard, or danger to the public or otherwise, those with vicious propensities and those with emotional, physical, psychological, racist, biased and/or physiological traits or characteristics unsuitable, unstable, or contraindicated for such employment.

138.    At all relevant times, it was the duty of the Defendant ECFS to sufficiently hire, train, retain personnel within its school so as to sufficiently discipline, supervise, promulgate, and put into effect appropriate rules applicable to the duties, behavior and activities of their servants, agents, employees and/or personnel.

139.    As a result of the Defendant ECFS' breach of these duties, ECFS employed administrators, personnel and staff who improperly handled incidents of racial animus, bigotry, educational inequities and prejudice against African-Americans. This failure to train, supervise and retain these individuals was negligent and caused the Plaintiffs herein to suffer severe injuries

and damage, without fault or contribution by the Plaintiffs.  As such, the Plaintiffs suffered and continue to suffer extreme physical, mental and emotional harm and distress.

140.    This action falls within one or more of the exceptions set forth in CPLR 1602.

141.    Pursuant to CPLR Section 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to Plaintiffs' non-economic loss, irrespective of the provisions of the CPLR Section 1601, by reason of the fact that Defendants owed the Plaintiffs a non-delegable duty of care.

142.    Pursuant to CPLR Section 1602(7), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to Plaintiffs' non-economic loss, irrespective of the provisions of the CPLR Section 1601, by reason of the fact that Defendants acted with reckless disregard of the safety of others.

143.    Pursuant to CPLR Section 1602(2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to Plaintiffs' non-economic loss, irrespective of the provisions of the CPLR Section 1601, by reason of the fact that said Defendants are vicariously liable for the negligent acts and omissions of each other and/or others who caused or contributed to the Plaintiffs' damages.

144.    Pursuant to CPLR Section 1602(11), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to Plaintiffs' non-economic loss, irrespective of the provisions of the CPLR Section 1601, by reason of the fact that Defendants acted knowingly or intentionally, and in concert, to cause the acts or failures which are a proximate cause of Plaintiffs' injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York, and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages;

D.      An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including but not limited to, compensation for their severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus pre-judgment interest;

F.     An award of punitive damages, in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter;

G.     An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      January 26, 2022

Respectfully submitted,

THE COCHRAN FIRM

_____
DEREK S. SELLS - 8891
MINA Q. MALIK
Counsel for Plaintiff
55 Broadway, 23rd Floor
New York, New York 10006
(Tel No.)  (212) 553-9215
(Facsimile) (212) 227-8763
dsells@cochranfirm.com
mmalik@cochranfirm.com

**ATTORNEY'S VERIFICATION**

STATE OF NEW YORK    )
                                          ).SS:
COUNTY OF NEW YORK )

The undersigned, an attorney, duly admitted to practice law in the Courts of the State of New York, and hereby deposes and states that:

I am the Managing Partner of THE COCHRAN FIRM, attorneys for the petitioners in the above action.  I have read the annexed **SECOND AMENDED COMPLAINT** and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon the following: investigation, interviews with client, records, reports, documents, correspondence, data, memoranda, etc., contained in the file.

The reason I make this verification instead of the petitioners, is that the petitioners reside out of the County of New York, wherein I maintain my offices.

I affirm that the foregoing statements are true under the penalties of perjury.

Dated: New York, New York
            January 26, 2022

_____
DEREK S. SELLS